**SAVE OUR INVALUABLE LAND (SOIL), INC., et al., Appellants,**

v.

**Colonel William R. NEEDHAM et al., Appellees,**

and

**City of Olathe, Kansas, et al., Intervenor-Appellees.**

**No. 75–1511.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 21, 1976.

Decided Sept. 29, 1976.

Arthur A. Benson, II, Kansas City, Mo., for appellants.

Eva R. Datz, Dept. of Justice, Washington D.C. (Peter R. Taft, Asst. Atty. Gen., Washington D.C., E. Edward Johnson, U. S. Atty., Roger K. Weatherby, Asst. U. S. Atty., Topeka, Kan., and Jacques B. Gelin, Dept. of Justice, Washington D.C., on the brief), for federal appellees.

F. Philip Kirwan, Kansas City, Mo. (Lyman Field, Kansas City, Mo., Joseph H. McDowell, Kansas City, Kan., Margolin & Kirwan, Washington D.C., of counsel; Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, Mo., on the brief), for intervenor-appellees.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a suit to enjoin the Corps of Engineers from constructing the Hillsdale Dam on the Big Bull Creek in Miami County, Kansas. The action was instituted by Save Our Invaluable Land (SOIL), Inc., a non-profit organization organized under the laws of Kansas, whose members are, in the main, landowners who reside in the area of the proposed dam site. The gist of the complaint is that the Corps of Engineers has not complied with the requirements of the Federal Water Pollution Control Act, the National Environmental Policy Act, and the Water Supply Act. Named as parties defendant, in addition to the Corps of Engineers, were various administrative officers of the Environmental Protection Agency. By answer the federal defendants alleged compliance with the several acts of Congress with which we are here concerned, and attached to the answer a copy of the final Environmental Impact Statement (EIS) prepared by the Corps of Engineers in November 1971, and filed with the Council on Environmental Quality on February 2, 1972.

Trial of this matter was to the court, sitting without a jury, and after a four-day

trial the judge found in favor of the defendants and dismissed the action. The trial court made elaborate findings and conclusions, consisting of some 43 pages. SOIL now appeals. We affirm.

On appeal SOIL raises essentially three points: (1) the trial court erred in finding that Section 102(b)(3) of the 1972 Amendments to the Federal Water Pollution Control Act did not apply to the Hillsdale Dam; (2) the trial court erred in concluding that the Corps's EIS met the requirements of the National Environmental Policy Act of 1969, and that the Corps otherwise met the requirements of the Fish and Wildlife Coordination Act of 1958; and (3) the trial court erred in concluding that the inclusion of storage for water supply as a project purpose met the requirements of the Water Supply Act of 1958, as amended. We shall discuss these several matters seriatim.

## I. 1972 Amendments to the Federal Water Pollution Control Act

SOIL initially argues that the trial court erred in holding that Section 102(b)(3) of the 1972 Amendments to the Federal Water Pollution Control Act did not apply to the Hillsdale Dam. That section, which appears as 33 U.S.C. § 1252(b)(3), reads as follows:

(3) The need for, the value of, and the impact of, storage for water quality control shall be determined by the Administrator, and his views on these matters shall be set forth in any report or presentation to Congress proposing authorization or construction of any reservoir including such storage.

The above quoted statute needs to be set in a bit of historical context. Prior to the 1972 amendments, storage of water for the purpose of controlling the quality of a stream was one method, though not the only one, authorized by Congress in its attack on the problem of water pollution. Under this particular approach water was stored to be released when the natural flow in a stream was low, thereby augmenting the stream flow and diluting the pollution entering the stream below the storage facility. This low flow augmentation did nothing to eliminate pollution, as such, but was only designed to keep pollution at acceptable levels.

In 1972 Congress shifted the emphasis to an elimination of the so-called point sources of pollution. Illustrative of this changed approach to the water pollution problem is 33 U.S.C. § 1252(b)(1), which reads as follows:

(b)(1) In the survey or planning of any reservoir by the Corps of Engineers, Bureau of Reclamation, or other Federal agency, consideration shall be given to inclusion of storage for regulation of streamflow, except that any such storage and water releases shall not be provided as a substitute for adequate treatment or other methods of controlling waste at the source.

The Hillsdale Dam was authorized by Congress in 1954 as one segment of a nine-part reservoir system in the Osage-Marias des Cygnes River Basin in Kansas. In 1961, and again in 1966, the project was deferred for further study. The restudy was finally completed and the project entered the advanced engineering and design phase with Congress appropriating funds for such planning for fiscal years 1968 through 1972. On August 25, 1972, Congress appropriated funds to initiate construction of the dam. The 1972 Amendments to the Federal Water Pollution Control Act became law on October 18, 1972. It was in this setting that the trial court held that 33 U.S.C. § 1252(b)(3) did not apply to the Hillsdale Dam. Under the circumstances, we agree.

In the instant case one of the purposes of the Hillsdale Dam was admittedly water quality control. Other purposes were flood control, water supply, recreation, and fish and wildlife. And each of these purposes, as well as other matters, was taken into consideration in arriving at a final cost/benefit ratio. It is SOIL's position that the Corps of Engineers failed to comply with 33 U.S.C. § 1252(b)(3) in that the EPA Administrator did not determine the need for, the value of, and the impact of storage for water control, nor were his

views on these matters set forth in "any report or presentation to Congress proposing authorization or construction of any reservoir including such storage," as mentioned in the statute. As indicated, both the Corps, as well as the EPA, are of the view that § 1252(b)(3) does not apply to the Hillsdale Dam inasmuch as the authorization for the dam and its construction had cleared Congress before the enactment of § 1252(b)(3).

As above indicated, we are of the view that § 1252(b)(3) does not apply to the Hillsdale Dam. In support thereof, *see,* for example, *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404 (W.D.Va.1973), aff'd on appeal, 484 F.2d 453 (4th Cir. 1973). In its affirmance the Fourth Circuit held that neither § 1252(b)(1) nor (3) applied to the dam there under consideration, because "[t]he dam is neither in the survey or planning stage, nor is it before Congress for authorization or construction. Those stages have long passed." The foregoing applies to the instant case with equal vigor, even though actual construction of the Hillsdale Dam was delayed by temporary impoundment of budgeted funds. The issue is not whether the Corps because of such delay *could* have complied with § 1252(b)(3), if it chose to do so. Rather the issue is whether under the circumstances, the Corps, and the EPA, were required to comply with § 1252(b)(3). We think they were not.

In further support of our holding, *see also Environmental Defense Fund v. Tennessee Valley Authority,* 371 F.Supp. 1004 (E.D. Tenn.1973), aff'd, 492 F.2d 466 (6th Cir. 1974). To the same effect, *see Sierra Club v. Froehlke,* 392 F.Supp. 130 (E.D.Mo.1975), where that court flatly declared that "the plain language of the statute [33 U.S.C. § 1252(b)(1) and (3)] indicates that it is applicable only to projects which are in the planning or preauthorization stages."

We do not regard *State of Ohio ex rel. Brown v. Callaway,* 497 F.2d 1235 (6th Cir. 1974) to be apposite to the present problem. There the problem was primarily one of intervention. In any event, we believe that the result reached by the Fourth Circuit in *Cape Henry Bird Club* is the proper one and more properly fits the particular facts of our case.

■ As indicated, the interpretation we have given § 1252(b)(3) concerning its applicability to Hillsdale Dam is the interpretation which has heretofore been adopted by both EPA and the Corps. The interpretation given a statute by the administrative agency charged with its administration is entitled to weight. Such fact fortifies us in our conclusion that the interpretation which we give § 1252(b)(3) is " 'correct,' to the extent that any particular interpretation of a complex statute such as this is the 'correct' one." *Train v. Natural Resources Defense Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

## II. Sufficiency of the Environmental Impact Statement (EIS)

SOIL contends that the Corps has not complied with 42 U.S.C. § 4332(A)(B) and (C). Sections (A) and (B) are, in a sense, declarations of policy, and to effectuate such policies, Section (C) requires that an environmental impact statement be filed on all major federal actions, and lists five specific matters to be covered in such statement. Section (C) is apparently designed to make certain that there be compliance with the statement of policy announced in Sections (A) and (B). In the instant case the Corps filed a 57-page EIS, which included some 32 pages of comments by other governmental agencies, both state and federal, together with the Corps's response to each comment. Such was not enough, asserts SOIL. We disagree.

■ Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. § 4332(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas? *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974) and *National Helium Corporation v.*

*Morton,* 486 F.2d 995 (10th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1973). Thus, in a real sense, an EIS is to be tested by the concepts of "good faith" and a "reasonable" discussion of the five mandated areas of subject matter. Perfection is not the test. *Environmental Defense Fund v. Corps of Engineers of the United States Army,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972). Nor should the courts in evaluating an EIS engage in hindsight judgment by way of second guessing.

■ Judged by the foregoing standard, our study of the EIS filed by the Corps in the instant case convinces us, as it did the trial court, that there was compliance with 42 U.S.C. § 4332(A)(B) and (C). In sum, the Corps did consider the impact on the environment of the construction of the Hillsdale Dam, possible alternatives, and ways of easing the impact on the environment from the building of the dam. In preparing its EIS the Corps did not ignore the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. § 661, *et seq.* Also, the cost/benefit ratio was in our view adequately covered, when the EIS is considered in its entirety. *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974). We think the EIS was sufficient.

### III. Water Supply Act of 1958

SOIL's final contention is that the Corps has failed to comply with the Water Supply Act of 1958, as amended. 43 U.S.C. 390b. Section 390b declares it to be the policy of the Congress to recognize that the primary responsibility for developing water supplies for local domestic use rests on "the States and local interests." In furtherance of this policy § 390b(b) provides that prior to the construction of any federal project which includes water supply provisions for *present* demands, "State or local interests shall agree to pay for the cost of such provisions." As regarding *future* water demands, that same section further provides that a certain per cent of the "total estimated cost of any project may be allocated to anticipated future demands when the

State or local interests give reasonable assurance, and there is reasonable evidence, that such demands for the use of such storage will be made within a period of time which will permit paying out the costs allocated to water supply within the life of the project."

As mentioned at the outset, one of the purposes of the Hillsdale Dam is to store water for domestic use by the surrounding communities. It is agreed by the parties that, insofar as *present* demand is concerned, there is an existing contract between the United States and the State of Kansas acting through the Kansas Water Resource Board which requires state and local interests to pay for the cost of storage to meet such present demand.

The dispute here is over whether the State and local interests have given the Corps reasonable assurances as to anticipated future demand, and whether there is reasonable evidence on the basis of which the Corps could conclude that demands will be made within a period of time which will permit paying out the allocated costs within the life of the project. This particular matter was fully explored at the trial of this matter, and the trial court concluded, in effect, if not in so many words, that the Corps did have "reasonable assurances," and that there was "reasonable evidence" that there would be such future demand. *SOIL* suggests that this finding is not supported by the record and is indeed clearly erroneous. We do not agree.

■ As indicated, it is agreed that State and local interests have contractually agreed to pay for the project insofar as *present* demand is concerned. We think the record indicates that the Corps was also given "reasonable assurances" by these same State and local interests that there will be a future demand for water which will permit paying out the allocated costs within the life of the project, and that there was "reasonable evidence" to indicate that there would be such demand. In this regard we refer to the letter from the Kansas Water Resource Board, dated August 2, 1973, wherein the Board advised the Corps

that it would have need for the project's anticipated water supply. That letter itself sets forth data which establishes the factual basis for the prediction. Moreover, a contract was later entered into between the State and local interests and the United States concerning both present and future water supply, and the payment thereof. All things considered, then, the record shows compliance with the Water Supply Act of 1958.

Judgment affirmed.