698 F.2d 1088
 18 ERC 2008, 13 Envtl. L. Rep. 20,415
 Matt JOHNSTON, Mike Johnston, Associated Enterprises, Inc.,
a Wyoming corporation, and Bard Ranch Company, a
Wyoming corporation, Plaintiffs-Appellants,
v.
R.M. DAVIS, Administrator of the Soil Conservation Service,
United States Department of Agriculture, et al.,
Defendants-Appellees.
Toltec Watershed Improvement District, Intervenor.
 No. 80-2297.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 25, 1983.
 
 Kim D. Cannon, Sheridan, Wyo. (Henry A. Burgess, Sheridan, Wyo., with him on the brief) of Burgess & Davis, Sheridan, Wyo., for plaintiffs-appellants.
 Dirk D. Snel, Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Laura Frossard, Dept. of Justice, Washington, D.C., and Toshiro Suyematsu, U.S. Atty., Cheyenne, Wyo., with him on the brief), for defendants-appellees.
 Fred W. Phifer, Wheatland, Wyo. (Sky D. Phifer, Wheatland, Wyo., with him on the brief) of Phifer & Phifer, Wheatland, Wyo., for intervenor.
 Before SETH, Chief Judge, and McWILLIAMS and McKAY, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 This case presents the latest chapter in litigation concerning the Toltec Reservoir Project.[1] In this appeal, the plaintiffs rely on provisions of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Secs. 4321-4347 (1976) to challenge the project. They assert that the lower court erred in declaring that the Environmental Impact Statement ("EIS") describing the project was in full compliance with NEPA.[2]
 
 
 2
 The plaintiffs initiated this action in federal district court on September 20, 1978, demanding that the defendants prepare an EIS for the proposed reservoir. On October 12, 1978, the court ordered the defendants to prepare an EIS. The Soil Conservation Service ("SCS") published the final EIS in January 1980 and filed a counterclaim seeking a declaratory judgment that the document complied with the requirements of NEPA. After a trial on the matter, the district court granted the declaratory judgment.
 
 
 3
 The plaintiffs claim that the court erred in approving the EIS. They claim that the EIS does not comply with NEPA, because the SCS failed to consider a full range of environmental costs in comparing project alternatives and because the SCS applied an unreasonable discount factor in calculating the economic benefits of the project.
 
 I. The Standard of Review
 
 4
 Section 102(2)(C) of NEPA requires that all federal agencies prepare a detailed statement of environmental consequences--the EIS--"in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." NEPA Sec. 102(2)(C), 42 U.S.C. Sec. 4332(2)(C). NEPA contemplates that the preparation of an EIS will enhance environmental quality by compelling both disclosure and consideration of environmental factors in the agencies' decision-making process. See NEPA Sec. 2, 42 U.S.C. Sec. 4321. See also Save Lake Washington v. Frank, 641 F.2d 1330 (9th Cir.1981); Montgomery Environmental Coalition v. Costle, 646 F.2d 568 (D.C.Cir.1980); Sierra Club v. Morton, 510 F.2d 813 (5th Cir.1975); Iowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849 (8th Cir.1973); Silva v. Lynn, 482 F.2d 1282 (1st Cir.1973). In preparing an EIS, an agency is expected to take a "hard look" at the environmental consequences of the proposed action, and explicitly examine five subjects listed in the provisions of NEPA.[3] See Environmental Defense Fund v. Andrus, 619 F.2d 1368, 1376-77 (10th Cir.1980). In reviewing an agency's EIS, the court examines whether there is a reasonable, good faith, objective presentation of these subjects. Id. We stated the standard of review in Save Our Invaluable Land (SOIL), Inc. v. Needham, 542 F.2d 539 (10th Cir.1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977), as follows:
 
 
 5
 Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. Sec. 4322(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas?
 
 
 6
 542 F.2d at 542. See also, Manygoats v. Kleppe, 558 F.2d 556 (10th Cir.1977); Sierra Club v. Stamm, 507 F.2d 788 (10th Cir.1974), National Helium Corp. v. Morton, 486 F.2d 995 (10th Cir.1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). In applying this standard, the reviewing court must examine the data and methodology that underlie the EIS. However, this examination is performed for the limited purpose of insuring that the document is a good faith, objective, and reasonable explanation of environmental consequences that responds to the five topics of NEPA's concern.
 
 
 7
 II. Application of the Standard to the Toltec Reservoir EIS
 
 
 8
 A. "Unconsidered" Environmental Costs.
 
 
 9
 The plaintiffs claim that the EIS does not reasonably compare alternatives to the Toltec Reservoir Project, see NEPA Sec. 102(2)(C)(iii), 42 U.S.C. Sec. 4332(2)(C)(iii), because it does not fully consider or quantify a number of "environmental costs" resulting from the construction of the project. They claim that the EIS inadequately assesses the loss of productive capacity of inundated meadowland, the effect of severance by the reservoir of ranching lands, tax losses, depletion of water from a downstream reservoir, and the creation of mud flats adjacent to the reservoir.
 
 
 10
 The loss of productive capacity, the depletion of water from a downstream reservoir and the creation of mud flats are all effects identified in the EIS. Testimony in the record indicates that the SCS considered and evaluated these effects in preparing the EIS. The remaining two purported effects, severance and tax losses, were not discussed in the EIS. However, the record raises a substantial question whether these effects can be treated as adverse impacts of the project.
 
 
 11
 We agree with the district court that the plaintiffs have failed to demonstrate that the five effects they cite were inadequately discussed in the EIS. The EIS need not discuss every nuance of a proposed action, nor need it give various questionable effects the weight demanded by various proponents or opponents. See EDF v. Andrus, 619 F.2d at 1368. Instead it must give a reasonable and balanced discussion sufficient to permit an informed choice of alternatives. Id. The EIS provides a reasonably detailed discussion of the five subjects mandated by NEPA. See Save Our Invaluable Land, 542 F.2d at 542. The plaintiffs have failed to convince us that the alleged omissions detract materially from the assessment of environmental consequences or that they indicated bias or lack of good faith by the SCS in preparing the EIS.
 
 
 12
 B. The Discount Rate.
 
 
 13
 The plaintiffs claim that by applying a 3 1/4 percent discount rate in the economic analysis of the Toltec Reservoir Project, the EIS fails to comply with the requirements of NEPA. They claim that the use of this discount rate results in an unrealistic assessment of the present value of the project, and thereby prevents reasonable comparison of alternatives. See NEPA Sec. 102(2)(C)(iii), 42 U.S.C. Sec. 4332(C)(iii).
 
 
 14
 Congress has specified the discount rate formula to be used by federal agencies in calculating the present value of water resource projects. See Water Resources Development Act of 1974 ("WRDA"), Sec. 80, 42 U.S.C. Sec. 1962d-17 (1976). In prescribing the discount rate formula, Congress stated that it applies to "plan formulation and evaluation." WRDA Sec. 80(a), 42 U.S.C. Sec. 1962d-17(a). We conclude that by stating the application of the formula in such general terms, Congress intended it to be used in environmental impact statements as well as other types of project evaluations. Accordingly, the 3 1/4 percent discount rate can be used in the Toltec Reservoir Project EIS to compare alternatives, provided that the selection of this rate complies with the provisions of WRDA.
 
 
 15
 In utilizing the 3 1/4 percent discount rate, the SCS relied on section 80(b) of WRDA, which provides as follows:
 
 
 16
 In the case of any project authorized before January 3, 1969, if the appropriate non-Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-Federal share of project costs, the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after March 7, 1974.
 
 
 17
 WRDA Sec. 80(b), 42 U.S.C. Sec. 1962d-17(b). Section 80(b) recognizes that prior to the passage of WRDA, federal agencies applied an unrealistically low discount rate to water projects. The provision permits continued use of this low discount factor for certain projects commenced prior to the passage of WRDA. The apparent purpose of this provision is to permit continued construction of qualifying projects planned and authorized before the enactment of WRDA, notwithstanding the economic inefficiency that the projects exhibit when evaluated under a realistic discount rate. Section 80(b) represents a legislative judgment that water projects authorized under the past practice of using low discount rates should not be jeopardized by the new policy of applying a more realistic discounting formula.
 
 
 18
 Section 80(b) applies the discount rate in effect immediately prior to December 24, 1968, to projects authorized before January 3, 1969, provided that the non-federal sponsors have, prior to December 31, 1969, given "satisfactory assurances" to pay the required non-federal share of the project costs. The plaintiffs do not contest the SCS's determination that the Toltec Reservoir Project was authorized before January 3, 1969, or that the discount rate in effect immediately prior to December 24, 1968, was 3 1/4 percent. Instead, they claim that the local sponsor did not timely give "satisfactory assurances" to pay the required non-federal share of the project costs.
 
 
 19
 In enacting WRDA, Congress did not define the term "satisfactory assurances," nor did it explain why "satisfactory assurances" were a prerequisite to the prescribed discount rate. In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated that where statutes are drawn in such broad terms that there is "no law to apply," the agency's action under the statute is committed to agency discretion, and the action is not judicially reviewable. 401 U.S. at 410, 91 S.Ct. at 821 (interpreting section 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 701 (1976)). Despite the vague reach of the term "satisfactory assurances," the federal courts have concluded that it does provide "law to apply," and that consequently agency determinations of "satisfactory assurances" are judicially reviewable. Concerned Residents of Buck Hill Falls v. Grant, 537 F.2d 29, 35-36 (3d Cir.1976). See Environmental Defense Fund v. Marsh, 651 F.2d 983, 1002-03 (5th Cir.1981) (refusing to accept the agency's contention that the term provides "no law to apply" and evaluating "satisfactory assurances" under pertinent agency regulations); Burkey v. Ellis, 483 F.Supp. 897, 907-08 (N.D.Ala.1979) (applying "objective standard" in evaluating "satisfactory assurances"); Alabama ex. rel. Baxley v. Corps of Engineers, 411 F.Supp. 1261, 1271-72 (N.D.Ala.1976) (applying "objective standard" in evaluating "satisfactory assurances"). We therefore hold that the determination of "satisfactory assurances" is subject to judicial review. Nevertheless, the broad reach of the term vests substantial discretion in the agency. We therefore conclude that the agency's determination of "satisfactory assurances" should be reviewed under the "abuse of discretion" standard provided in section 10(e)(2)(A) of the Administrative Procedure Act. 5 U.S.C. Sec. 706(2)(A) (1976).[4] See Citizens to Protect Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Sabin v. Butz, 515 F.2d 1061 (10th Cir.1975).
 
 
 20
 The record indicates that the SCS did not abuse its discretion in determining that it had received "satisfactory assurances" prior to December 31, 1969, that non-federal participants would fund the non-federal portions of the project. An agent of the SCS testified at trial that in making the determination of "satisfactory assurances," the SCS considers whether it had received, prior to the pertinent date, a signed work plan agreement from a responsible local sponsor who evidences both sufficient resources and the intent to finance the non-federal share of the project. This standard is a reasonable interpretation of the statutory requirement for "satisfactory assurances."[5] Furthermore, the record indicates that this standard was timely met in the case of the Toltec Reservoir Project. A work plan agreement was executed on May 28, 1968, between the SCS and the local sponsor, the Toltec Watershed Improvement District. The sponsor's original organization was defective under Wyoming law; nevertheless the defects were cured by reorganization on May 14, 1969. During this period the sponsor made continuous efforts to advance the project. Following the reorganization but before December 31, 1969, the sponsor applied for a loan and financial assistance and adopted a resolution to issue bonds for financing the project. The record indicates that the District's bond resolution was realistic in light of the substantial amount of land that could be taxed to pay off the bonds. These considerations, taken together, demonstrate that the SCS was justified in concluding that the non-federal sponsor had met the agency's standard for determining "satisfactory assurances." We therefore conclude that the SCS did not abuse its discretion in formulating and applying its standard of "satisfactory assurances."
 
 
 21
 Having concluded that SCS satisfied the "satisfactory assurances" requirement in section 80(b) of the WRDA, we hold that the SCS was entitled to use a 3 1/4 percent discount rate in comparing alternatives in the Toltec Reservoir Project EIS.[6] However, our inquiry does not end with this determination. Although the SCS may use the 3 1/4 percent discount rate in this comparison, it may not use the rate in a manner that misleads the reader of the EIS. We find that the SCS has applied the 3 1/4 percent discount rate in a misleading manner by failing to make clear in the EIS that although the economic analysis calculated under this discount rate demonstrates that the Toltec Reservoir Project meets the cost-benefit standards imposed by Congress, this calculation does not represent a realistic assessment of the economic value of the project.
 
 
 22
 As we previously noted, Congress chose to retain an unrealistically low discount rate for projects approved prior to the passage of the WRDA. In doing so, Congress made a legislative judgment that these projects should proceed, notwithstanding the unfavorable economics that they exhibit when analyzed under realistic economic assumptions. As the defendants concede, the 3 1/4 percent discount rate is artificially low. Brief for the Federal Appellees at 11. The Assistant State Conservationist of the SCS indicated at trial that if the project were evaluated under the current, realistic interest rate of 7 1/8 percent, the costs would outweigh the benefits over the life of the project. He testified that the discount rate was selected, not on the basis of present and future economic conditions, but rather because "there was a commitment to do this project back in 1969." Record, vol. 5, at 134-40. Yet the EIS suggests without qualification that the project will produce net economic benefits. The EIS makes no mention of the artificially low discount rate, and instead flatly states that "[t]he present value of the net monetary benefits foregone without the project would be $645,470, or an average annual net amount of $26,290." Toltec Reservoir Project EIS at 3.
 
 
 23
 Such unqualified statements are clearly misleading in the context of an EIS, and result in an unreasonable comparison of alternatives to the proposed project. See Save Our Invaluable Land, 542 F.2d at 542. Although the SCS is obligated to use the 3 1/4 percent discount rate when it compares alternatives to the Toltec Reservoir Project, and thereby recognize the cost-benefit standards that Congress has imposed on pre-WRDA projects, it may not pretend that the cost-benefit analysis prepared under this discount rate represents a realistic assessment of the economic value of the project. We therefore hold that the Toltec Reservoir Project EIS must be revised to state explicitly in its discussion of the present values calculations that
 
 
 24
 (1) a 3 1/4 percent discount rate was used pursuant to section 80(b) of WRDA;
 
 
 25
 (2) this discount rate reflects a congressionally mandated standard for evaluation of water resource projects authorized prior to January 4, 1969;
 
 
 26
 (3) this discount rate is unrealistically low compared to rates presently used to evaluate water resource projects; and
 
 
 27
 (4) if this project were evaluated under the 7 1/8 percent discount rate presently used to evaluate water resource projects, the estimated costs of the project would exceed estimated benefits over the life of the project.
 
 
 28
 This revision imposes a minimal burden on the SCS. It provides the public and the agency decision-maker with information essential to understanding the comparison of alternatives to the proposed action. Moreover, the revision is necessary to ensure that the EIS provides a reasonable, good faith, and objective presentation of the subjects required by NEPA. See Save Our Invaluable Land, 542 F.2d at 542.
 
 III. Summary
 
 29
 We conclude that the Toltec Reservoir Project EIS adequately discusses the range of adverse environmental effects posed by the project and correctly applies a 3 1/4 percent discount rate in the comparison of costs and benefits. However, we hold that the EIS does not adequately explain and qualify the economic results rendered through the application of this unrealistically low discount rate, and thereby fails to provide the public and the decision-maker with an informed comparison of alternatives. Upon revision of the EIS in accordance with this opinion, the document will fully comply with the National Environmental Policy Act of 1969, 42 U.S.C. Sec. 4321-4347 (1976) and regulations promulgated thereunder.
 
 
 
 [1]
 The Toltec Reservoir Project was proposed under the Watershed Protection and Flood Prevention Act. See 16 U.S.C. Secs. 1001-1008 (1976) and subsequent amendments. It envisions the construction of a dam, reservoir, and related recreational facilities in the Upper North Laramie River Watershed of Albany County, Wyoming. The project, its purpose, and its history are described in a thorough opinion by Judge Brimmer below. See Johnston v. Davis, 500 F.Supp. 1323 (D.Wyo.1980)
 
 
 [2]
 The project is described in the Upper North Laramie River Watershed Final Environmental Impact Statement, USDA-SCS-EIS-WS-(ADM)-79-1-F-WY (January 1980) (hereinafter referred to as the Toltec Reservoir Project EIS)
 
 
 [3]
 NEPA describes the five subjects as follows:
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 NEPA, Sec. 102(2)(C), 42 U.S.C. Sec. 4332(2)(C) (1976).
 
 
 [4]
 Section 10(e) provides in pertinent part as follows:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 * * *
 * * *
 5 U.S.C. Sec. 706 (1976).
 
 
 [5]
 Of course, other interpretations are possible. For instance, an agency might require that in order to demonstrate "satisfactory assurances" a contract must have been executed that provides a binding monetary obligation. Given the scant legislative history on section 80(b) of WRDA, we have no basis for demanding the application of one standard rather than the other. Accordingly, we accept the agency's determination of the proper standard. See Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)
 
 
 [6]
 The plaintiffs advanced an additional argument that section 80(b) no longer applies to SCS projects because Congress enacted P.L. 95-28, which provides in pertinent part as follows:
 It is hereby reiterated that the interest rates or rates of discount to be used to assess the return on the Federal Government's investment in projects of the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation, shall be those interest rates or rates of discount established by Public Law 93-251, the Water Resources Development Act of 1974, ... or by any prior law authorizing projects of the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation.
 42 U.S.C. Sec. 1962d-17 note (Supp. IV 1980). The plaintiffs claim that since the SCS was not specifically mentioned in P.L. 95-28, the law repealed by implication the application of WRDA to the SCS. See Burkey v. Ellis, 483 F.Supp. 897, 908 (N.D.Ala.1979). The legislative history indicates that this provision simply reaffirms the provisions of WRDA. The author or this provision, Senator Johnston, stated as follows:
 The law of the land at this time is set out in the Water Resources Act of 1974 and in other congressional declarations. We are not changing the law one whit or one tittle in respect of interest rates. It is simply a reaffirmation of that. Apparently some in the executive do not understand what the law is and we are reminding them what the law is.
 
 
 [123]
 Cong.Rec. 7127 (March 10, 1977). Given the clear purpose of the provision simply to reiterate existing law, we reject the plaintiffs' argument of repeal by implication