840 F.2d 1432
 27 ERC 1852, 18 Envtl. L. Rep. 20,497
 ANIMAL DEFENSE COUNCIL; Friends of the Desert; Friends of
the Earth; Earth First; Animal Protection Institute of
America; Arizona Wildlife Federation; Citizens for Cap
Recharge; Paul Hirt, Plaintiffs-Appellants,
v.
Donald P. HODEL, in his official capacity as Secretary of
the Interior of the United States; C. Dale Duvall, in his
official capacity as Commissioner of the Bureau of
Reclamation; Edward M. Hallenbeck, in his official capacity
as Acting Regional Director of the Lower Colorado Region of
the Bureau of Reclamation; Larry D. Morton, in his official
capacity as Acting Project Manager of the Arizona Projects
Office of the Bureau of Reclamation, Defendants-Appellees,
Southern Arizona Water Resources Association; Central
Arizona Water Conservation District; City of
Tucson; Mountain States Legal
Foundation,
Defendants-Intervenors-Appellees.
 No. 86-2453.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 17, 1987.
Decided Feb. 24, 1988.
 
 Sean Bruner, Jacoby & Meyers, Tucson, Ariz., for plaintiffs-appellants.
 Martin W. Matzen, Dept. of Justice, Washington, D.C., for defendants-appellees.
 Casey Shpall, Mountain States Legal Foundation, Denver, Colo., for defendant-intervenor-appellee.
 Frederick S. Dean and Loretta Humphrey, Office of the City Attorney, Tucson, Ariz., and Marvin S. Cohen, Clifford J. Roth and Andrew L. de Mars, Winston & Strawn, Phoenix, Ariz., for defendant-intervenor-appellee City of Tucson.
 Ralph E. Hunsaker and Scott E. Boehm, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for defendant-intervenor-appellee Central Arizona Water Conservation Dist.
 Steven Weatherspoon, Chandler, Tullar, Udall & Redhair, Tucson, Ariz., for defendant-intervenor-appellee Southern Arizona Water Resources Ass'n.
 On Appeal from the United States District Court for the District of Arizona.
 Before HUG, NELSON and NOONAN, Circuit Judges.
 NELSON, Circuit Judge:
 
 
 1
 The Animal Defense Council and several other non-profit associations (Council) appeal from the district court's grant of summary judgment in favor of the Bureau of Reclamation of the United States Department of the Interior (Bureau). The Council brought suit under the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4321, et seq. (1982), challenging the sufficiency of the Final Environmental Impact Statement (EIS) on the Tucson Aqueduct Phase B of the Central Arizona Project.
 
 
 2
 The district court limited its review to the administrative record and granted the Bureau's motion for summary judgment, holding that the EIS was sufficient and that the Bureau did not need to prepare a supplemental EIS. This court has jurisdiction over this appeal under 28 U.S.C. Sec. 1291 (1982). We affirm.
 
 I. FACTUAL BACKGROUND
 
 3
 The Central Arizona Project (CAP) is part of a comprehensive plan to provide water from the Colorado River to arid regions in Arizona, as authorized by the Colorado River Basin Project Act, 43 U.S.C. Secs. 1501-21 (1982). The CAP water is part of Arizona's entitlement to Colorado River water. Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). The Tucson aqueduct is a feature of the CAP designed to convey this water to target regions in Arizona. The EIS at issue in this action describes the proposed construction, operation, and maintenance of Phase B of the Tucson aqueduct. Phase B will extend from the terminus of Phase A forty-five miles to the Tucson metropolitan area and to the south boundary of the San Xavier Indian Reservation.
 
 
 4
 On August 14, 1985, the Bureau filed its EIS for Phase B of the aqueduct. In the EIS, the Bureau discussed five alternative routes for the aqueduct as well as the alternative of no federal action. The Bureau in the EIS proposed the West Side Plan, a route located on the west side of the Tucson Mountains and utilizing a greater amount of open canal than the other alternatives. The Council preferred the East Side Plan, which consisted of a predominately closed canal located on the east side of the Tucson Mountains. Water conveyed within a closed canal has fewer biological impacts because fewer acres of habitat are lost and fewer wildlife movement areas are disrupted. At the time the EIS was issued, the Bureau's estimated total cost for construction and operation of the West Side Plan was approximately $55 million less that the cost of the East side plan.
 
 
 5
 The EIS provided for delivery of water to the Avra Valley Irrigation District (AVID) in each of the alternative plans. The East Side Plan included the cost of construction of a canal to deliver CAP water to the AVID, although the canal was not part of the federal aqueduct. The canal to AVID consisted of approximately six miles of open canal. Because the West Side Plan already passed through AVID, the cost of the canal was not included.
 
 
 6
 Prior to the issuance of the EIS, in April, 1985, AVID asked the Central Arizona Water Conservation District (CAWCD) for an extension of time to execute its subcontract for CAP water. Although AVID requested an extension to August 5, 1985, nine days before the filing of the EIS, the CAWCD granted an extension to September 3. Approximately two weeks after the publication of the EIS, AVID's final deadline to contract for the receipt of CAP water expired, thus eliminating the need in the East Side Plan for the six miles of open canal to convey water to AVID. The elimination of the canal dropped the estimated cost of the East Side Plan by $40 million, reducing the difference in cost between the East Side Plan and the Bureau's preferred West Side Plan to approximately $15-20 million. The cancellation of the canal also eliminated most of the environmental consequences of the East Side Plan because it eliminated the need for an open canal.
 
 
 7
 The Bureau provided revised cost comparison tables reflecting the elimination of the East Side canal to AVID. The Bureau concluded that supplementation of the EIS was not required because the only impact on the West Side Plan was that turnouts would not need to be constructed. In addition, the West Side Plan remained the least expensive alternative of the five considered because the Plan without the canal to AVID remained $15-20 million less expensive than the East Side Plan.
 
 
 8
 During the Bureau's planning for the Phase B aqueduct, Dr. C. Brent Cluff, an associate hydrologist at the University of Arizona, Tucson, advocated a groundwater recharge proposal. The proposal advocated using CAP waters to recharge the groundwater, which would then be recovered from the ground for use. The EIS indicated that the Bureau considered two plans involving recharge, one using an east side alignment and the other utilizing the Bureau's proposed west side alignment. Tables in the EIS set forth the comparative physical features and costs of these plans. The EIS indicated that although the groundwater recharge proposal had been extensively reviewed, the Bureau had decided to eliminate ground-water as a viable alternative because the proposals were less cost effective than the West Side Plan and because the proposals lacked support from the City of Tucson and the Southern Arizona Water Resources Association.
 
 
 9
 The EIS also discussed the differences in water quality between Colorado River water and local ground water. The EIS stated that the State of Arizona requires the treatment of all surface water used for drinking but does not require treatment of ground water. The EIS further stated that this treatment includes chlorination to remove microorganisms and bacteria and that EPA findings indicate that chlorination of surface water for drinking involves a potential cancer risk. Because of the high organic content of Colorado River water resulting from extensive upstream irrigation, the EIS suggested that Arizona officials should consider this risk in designing facilities to treat CAP water.
 
 
 10
 On September 24, 1985, the Bureau issued its record of decision, officially selecting the West Side Plan. The Bureau acknowledged that the West Side Plan had "significantly greater biological and cultural impacts," but that these impacts could be reduced to an acceptable level. The Bureau stated that it selected the West Side Plan because the Plan had the least construction and operating costs and because the Plan had strong public support.
 
 
 11
 On February 21, 1986, the Council filed suit under NEPA seeking declaratory and injunctive relief, and challenging the sufficiency of the EIS. Upon motions by the Bureau, the district court limited the scope of review to the administrative record and prohibited discovery unless the plaintiffs provided the court with adequate justification to grant the discovery request. The district court granted the Bureau's motion for summary judgment, holding that 1) the Bureau was not required to supplement the EIS to reflect new information because the new information related only to a rejected alternative route, not to the aqueduct route selected; and 2) the EIS did not have to include a worst case analysis of the risks associated with chlorination as a method of water purification; and 3) the EIS did not have to address the merits of an alternative groundwater recharge proposal.
 
 II. ISSUES PRESENTED
 
 12
 1. Did the district court err in limiting the scope of review to the administrative record and in prohibiting discovery unless the Council provided adequate justification for discovery requests?
 
 
 13
 2. Was the Bureau required to supplement its EIS to reflect post-EIS changes affecting the features and cost of a rejected alternative?
 
 
 14
 3. Should the Bureau have included in its EIS a worst case analysis of the possible health effects of the City of Tucson's water treatment process?
 
 
 15
 4. Did the EIS adequately address groundwater recharge as a possible means for storage of CAP water to be delivered by the aqueduct?
 
 III. STANDARD OF REVIEW
 
 16
 In NEPA actions, this court reviews de novo the district court's grant of summary judgment. City of Angoon v. Hodel, 803 F.2d 1016, 1019-20 (9th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987). Therefore, this court applies the standard set forth in Fed.R.Civ.P. 56(c). Viewing the evidence in the light most favorable to the Council, this court determines "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." City of Angoon, 803 F.2d at 1020.
 
 
 17
 Judicial review of agency action in preparing an EIS is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(D) (1982). See Stop H-3 Association v. Dole, 740 F.2d 1442, 1461 (9th Cir.1984), cert. denied, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). Therefore, "[t]he adequacy of an EIS depends upon whether it was prepared in observance of the procedure required by law." State of California v. Block, 690 F.2d 753, 761 (9th Cir.1982). Under this standard, we employ a "rule of reason," inquiring (1) "whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences,' " id. (quoting Trout Unlimited, Inc. v. Morton, 509 F.2d 1276, 1283 (9th Cir.1974), and (2) "whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Id.; see Stop H-3, 740 F.2d at 1461. "Once satisfied that the agency has taken this procedural and substantive 'hard look' at environmental consequences in the EIS, the court's review is at an end." Id. (citations omitted).
 
 IV. SCOPE OF REVIEW AND DISCOVERY
 
 18
 The district court limited the scope of its review to the administrative record and prohibited discovery unless the Council provided the court with adequate justification regarding the discovery request.
 
 
 19
 Generally, judicial review of agency action is limited to review of the administrative record. Friends of the Earth v. Hintz, 800 F.2d 822, 828 (9th Cir.1986). In Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), the Supreme Court emphasized that when reviewing administrative decisions:
 
 
 20
 "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. Sec. 706, to the agency decision based on the record the agency presents to the reviewing court.
 
 
 21
 Id. at 743-44, 105 S.Ct. at 1607 (quoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). This standard is applicable to review of agency action under NEPA. Hintz, 800 F.2d at 829.
 
 
 22
 However, certain circumstances may justify expanding review beyond the record or permitting discovery. See, e.g., Public Power Council v. Johnson, 674 F.2d 791, 793 (9th Cir.1982). The district court may inquire outside the administrative record when necessary to explain the agency's action. Id. at 793-94. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. Hintz, 800 F.2d at 829.
 
 
 23
 The district court may also inquire outside of the administrative record "when it appears the agency has relied on documents or materials not included in the record." Id. In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. Id.
 
 
 24
 The Council does not argue that the Bureau's action cannot be explained on the basis of the administrative record. Here, the administrative record was fully developed and open for public comment prior to the Bureau's decision to select the West Side Plan. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (where no formal findings made by administrator, a court may examine information outside of the administrative record). Rather, the Council contends that the Bureau ignored or inadequately explored information presented to it. The Council cites the information presented by Dr. Cluff regarding groundwater recharge and available information from the Environmental Protection Agency (EPA) concerning the health risks attendant to water purification as two instances of information ignored or inadequately discussed by the Bureau in its EIS.
 
 
 25
 The Council relies on the Second Circuit decision County of Suffolk v. Secretary of the Interior, 562 F.2d 1368 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), to support its contention that the district court should not have limited its review to the administrative record and should have allowed discovery. In County of Suffolk, the court held that the district court may extend its review beyond the administrative record and permit the introduction of new evidence in NEPA cases where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism ... under the rug.' " 562 F.2d at 1384-85 (quoting Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir.1973)). The court distinguished NEPA cases from other cases involving review of agency action, stating:
 
 
 26
 [I]n NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.
 
 
 27
 Id. at 1384. (citations omitted).
 
 
 28
 Even under this analysis, we find that the Council's contention that the district court should have permitted discovery and extended its review beyond the administrative record is without merit. Other courts have held that an allegation that an EIS has failed to mention a serious environmental consequence may be sufficient to permit the introduction of new evidence outside of the administrative record, see id. at 1384-85. In this case, however, the Council's allegations are not sufficient because the administrative record and EIS contain adequate information to respond to the allegations. The Council makes no showing that the district court needed to go outside the administrative record to determine whether the Bureau ignored information or to evaluate the Bureau's discussion of alternatives.
 
 
 29
 The EIS discusses the information the Council contends was ignored or inadequately explored. The EIS demonstrates that the Bureau considered two plans involving recharge, one using an east side alignment like that proposed by Dr. Cluff and another using the Bureau's proposed west side alignment. The EIS also sets forth in tabular form the comparative costs and physical features of the recharge alternatives. In its EIS, the Bureau discussed why it eliminated the recharge plans as viable alternatives, stating that the plans were less cost effective than the West Side Plan and that the plans lacked support from the City of Tucson and the Southern Arizona Water Resources Association.
 
 
 30
 Likewise, the Council's contention that information regarding the health risks of water purification was ignored is also without merit. The EIS points out that Arizona requires treatment of surface water but not groundwater used for drinking purposes and that this treatment includes chlorination. The EIS states that recent EPA findings indicate that "normal chlorination of surface water for drinking may produce trihalomethane (THM), a known cancer agent. Being high in organic content as a result of upstream irrigation use, Colorado River water diverted by the CAP may be susceptible to THM production during chlorination."
 
 
 31
 The Council also argues that the district court should have looked beyond the administrative record under a final exception. Courts may inquire outside the agency record when plaintiffs make a showing of agency bad faith. See Public Power Council, 674 F.2d at 795. For this exception to apply, "[n]ormally there must be a strong showing of bad faith or improper behavior before the court may inquire into the thought processes of administrative decisionmakers." Id. See Overton Park, 401 U.S. at 420, 91 S.Ct. at 825 ("where there are administrative findings that were made at the same time as the decision, ... there must be a strong showing of bad faith or improper behavior" before a court will inquire into the mental processes of decisionmakers).
 
 
 32
 The Council contends that the Bureau in fact knew before issuing the EIS that AVID would not require the $40 million canal included in the Bureau's estimated cost of the East Side Plan. The Council argues that limiting the administrative record and prohibiting discovery without adequate justification prevented it from gathering the facts necessary to make out its bad faith claim.
 
 
 33
 The Council, however, fails to show that the Bureau acted in bad faith or acted improperly with respect to its knowledge about AVID or that discovery would have helped the Council make that showing. See Overton Park, 401 U.S. at 420, 91 S.Ct. at 825; Public Power Council, 674 F.2d at 795. Contrary to the Council's contentions, the administrative record is already replete with references to AVID's numerous delays and extensions of time to apply for CAP water, as well as the reasons it gave for the delay. The record suggests that the Bureau had a good faith belief that the canal to AVID would have to be built. In addition, the Bureau, in order to prepare an adequate EIS, had a duty to include "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of its actions. Trout Unlimited, 509 F.2d at 1283. Because of the probability that the canal would have to be built, the Bureau had a duty to discuss the Avra Valley canal in its EIS to provide a thorough discussion of the probable environmental consequences of its actions.
 
 
 34
 The Council has not demonstrated that it falls within any of the exceptions to the general rule that review of agency action is limited to the administrative record. Therefore, the district court properly limited review to the administrative record and refused to permit discovery unless the Council provided adequate justification.
 
 V. SUFFICIENCY OF THE EIS
 A. Supplementation of the EIS
 
 35
 The Council contends that the failure of AVID to contract for CAP water as envisioned in the EIS compelled the Bureau to supplement or revise its EIS to reflect the changed environmental and financial effects on the East Side Plan. The district court held that the Bureau was not required to supplement its EIS because the elimination of the Avra Valley delivery line affected only a rejected alternative, and therefore was not a change in the proposed action. The court further held that the Council did not substantiate its claim that defendants were aware that the Avra Valley pipeline would never be built for a year before it published the EIS.
 
 
 36
 NEPA mandates that an agency must continue to gather and evaluate new information relating to the environmental impact of its actions even after issuance of an EIS. Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1023-24 (9th Cir.1980); Enos v. Marsh, 769 F.2d 1363, 1373 (9th Cir.1985); see 42 U.S.C. Sec. 4332(2)(A), (B). Supplementation of environmental impact statements under NEPA is governed by 40 C.F.R. Sec. 1502.9(c)(1) (1986). The regulation provides that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if ... [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id.
 
 
 37
 We will uphold an agency's decision not to supplement an EIS if the decision is reasonable. Stop H-3, 740 F.2d at 1463. The agency must consider and evaluate new information that comes to light and make a reasoned determination whether the information is significant and requires supplementation of the EIS. Id. at 1463-64. As we stated in Stop H-3:
 
 
 38
 Reasonableness depends on the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.
 
 
 39
 Id. at 1464.
 
 
 40
 Here, it is clear that the Bureau considered and evaluated AVID's decision not to contract for CAP water. The Bureau determined that this new development would have a de minimis effect upon its proposed West Side Plan, finding that Avra Valley turnouts from the aqueduct would not have to be built. The Bureau further studied the effect of the changes on the rejected alternatives, providing plaintiffs with cost comparison tables and reaffirming its decision to select the West Side route:
 
 
 41
 The Bureau has reviewed the cost difference due to not serving AVID. The West Side Plan is the least cost plan, requires fewer relocations, disrupts fewer residential and commercial areas in terms of noise and inconvenience during construction, and offers greater opportunity for development of recreation trails and trail related activities; the East Side Plan would require a $15 to $20 million greater federal expenditure.
 
 
 42
 Letter from Clifford I. Barrett, Acting Commissioner, United States Department of the Interior, to David R. Furrey, Superintendent, Flowing Wells Irrigation District (October 29, 1985).
 
 
 43
 However, the Bureau was not required to supplement its EIS to reflect the changes in a rejected alternative because its decision not to supplement the EIS was reasonable under the Stop H-3 test. Even after discounting the cost of serving Avid from the overall cost of the East Side Plan, that Plan would still have cost $15 to $20 million more than the West Side Plan. It was reasonable for the Bureau to conclude that the decrease in cost of the East Side Plan did not rise to the level of environmental significance which would warrant a supplement to the EIS. Moreover, the Bureau carefully considered the information, evaluated its impact, and supported its decision not to supplement with a statement of explanation. See Stop H-3, 740 F.2d at 1464.
 
 
 44
 The Council alleges that the EIS was so filled with misinformation and incorrect cost figures that the Bureau must revise its EIS to adequately provide the public with an informed comparison of alternatives. Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide "a reasonable, good faith, and objective presentation of the subjects required by NEPA." Johnston v. Davis, 698 F.2d 1088, 1095 (10th Cir.1983) (revision of EIS necessary where use of artificially low discount rate resulted in unreasonable comparison of alternatives to proposed project); see also National Wildlife Federation v. Andrus, 440 F.Supp. 1245, 1254 (D.D.C.1977) (EIS deficient where several alternatives were not treated in the EIS and the EIS did not set forth reasons why these alternatives were rejected).
 
 
 45
 If the Council had substantiated its claim concerning misleading information, the Council might have stated a claim that the information in the initial EIS was so incomplete or misleading that an informed comparison of alternatives was not possible. See Johnston, 698 F.2d at 1095. However, we find no substantiation for the Council's broad assertions in the record. To support its claim of error, the Council points to a $150 million discrepancy between the $60 million figure estimated in the EIS as the cost of Tucson's water treatment plant and distribution system and the $211 million figure estimated in the administrative record as the total cost of conveying Tucson water to the existing distribution system. However, as the Bureau pointed out, the $211 million figure included the distribution system growth for the next thirty-five years.
 
 
 46
 In addition, the Council alleges that the Bureau acted in bad faith in preparing the EIS. We find no substantiation in the record for the assertion that the Bureau was aware that the Avra Valley canal would not be built prior to the issuance of its EIS. The information in the EIS concerning the Avra Valley was complete and provided the basis for an informed comparison at the time the EIS was prepared. Once new information surfaced, the Bureau's decision not to supplement the EIS was reasonable because the Bureau carefully considered the information, evaluated its impact, and supported its decision not to supplement its EIS with a statement of explanation. See Stop H-3, 740 F.2d at 1464.
 
 B. Worst Case Analysis
 
 47
 The Council asserts that the EIS should have included a worst case analysis of the health consequences of chlorination of CAP water. The EIS provides:
 
 
 48
 [T]he State of Arizona requires the treatment of all surface water used for drinking purposes and no treatment is required for ground water. Surface water treatment consists of filtration to remove suspended particles, and chlorination to remove microorganisms and bacteria. Recent findings of the EPA indicates, however, that normal chlorination of surface water for drinking may produce trihalomethane (THM), a known cancer agent. Being high in organic content as a result of extensive upstream irrigation use, Colorado River water diverted by the CAP may be susceptible to THM production during chlorination. This factor should be considered in the design of water treatment plants utilizing CAP waters, although not currently a state or Federal requirement in the treatment of surface waters for drinking purposes.
 
 
 49
 EIS at 67. Under the applicable Council on Environmental Quality (CEQ) regulation, an EIS must include a worst case analysis when "the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known."[1] 40 C.F.R. Sec. 1502.22, amended by 40 C.F.R. Sec. 1502.22 (1986); Save Our Ecosystems v. Clark, 747 F.2d 1240, 1243 (9th Cir.1984).
 
 
 50
 The Council has not demonstrated that the health effects of chlorination were important or essential to the decision concerning the location of the aqueduct. See Save Our Ecosystems, 747 F.2d at 1244-45. Both plans call for conveyance of Colorado River water. The EIS states that, because of the high organic content of Colorado River water, Tucson must treat CAP water regardless of the location of the aqueduct. Thus, the potential health effects involved with chlorine treatment have no bearing on the choice between the East Side Plan and the West Side Plan.[2]
 
 
 51
 Moreover, the Bureau was not required to include a worst case analysis in its EIS because the triggering criteria of former Sec. 1502.22 were not met. Former Sec. 1502.22 requires a worst case analysis when information is unknown or uncertain. The Council has failed to establish that the risk of cancer from chlorination was unknown or uncertain. See Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 988 (9th Cir.1985). We affirm the district court's holding that the Bureau did not need to include a worst case analysis of the health effects of chlorination in its EIS.
 
 C. Groundwater Recharge
 
 52
 NEPA does not require that an EIS consider every possible alternative, only that it consider every reasonable alternative. Citizens for a Better Henderson v. Hodel, 768 F.2d 1051, 1057 (9th Cir.1985). The district court held that the EIS did not need to address recharge because recharge is a method of water storage and is not part of the federal project. The portion of the Central Arizona Project described in the EIS involves the construction of an aqueduct. As stated in the EIS, "[a]lthough the recharge proposal has been included in some of the plans, the fact remains that its implementation is a local decision and that it is not a part of the CAP." In addition, the location of Tucson aqueduct Phase B does not foreclose future use of recharge by the City of Tucson. The decision whether a recharge system will be utilized is the responsibility of the City of Tucson. We agree with the district court that because recharge is not part of the federal project, the Bureau was not obligated to discuss it in the EIS. See Enos, 769 F.2d at 1371.
 
 
 53
 CEQ regulations require a brief discussion in the EIS of the reasons for eliminating an alternative from more detailed analysis. 40 C.F.R. Sec. 1502.14(a) (1986). The Council contends that the EIS did not properly analyze the costs and benefits of groundwater recharge as a method of storing CAP water. However, the record indicates that groundwater recharge was extensively studied by the Bureau before it issued the EIS and that the proposal was rejected as a viable alternative to the aqueduct routes under consideration. The Bureau therefore treated groundwater recharge as a rejected alternative and only briefly discussed it in the EIS, stating that it was eliminated as a viable alternative because it was less cost effective than the West Side Plan and because it lacked support from the City of Tucson and the Southern Arizona Water Resources Association. Because groundwater recharge was rejected as a reasonable alternative, the proposal did not require a detailed discussion of recharge costs and benefits.
 
 
 54
 The judgment of the district court is affirmed.
 
 
 55
 AFFIRMED.
 
 
 
 [1]
 40 C.F.R. Sec. 1502.22 was amended on April 25, 1986. The amended regulation applies to environmental impact statements for which a Notice of Intent is published in the Federal Register on or after May 27, 1986. 40 C.F.R. Sec. 1502.22(c). Because the Notice of Intent for the EIS in this action was published in January, 1984, former Sec. 1502.22 governs. Former Sec. 1502.22 provides:
 Incomplete or unavailable information.
 When an agency is evaluating significant adverse effects on the human environment in an environmental impact statement and there are gaps in relevant information or scientific uncertainty, the agency shall always make clear that such information is lacking or that uncertainty exists.
 (a) If the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.
 (b) If (1) the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are exorbitant or (2) the information relevant to adverse impacts is important to the decision and the means to obtain it are not known (e.g., the means for obtaining it are beyond the state of the art) the agency shall weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty. If the agency proceeds, it shall include a worst case analysis and an indication of the probability or improbability of its occurrence.
 
 
 [2]
 It is unclear whether recharge of CAP water would remove the need for chlorination treatment, and therefore it was reasonable for the Bureau to conclude that there was no significant difference in health effects between the two plans. At oral argument, counsel for the Bureau indicated that the City of Tucson would not rely on recharge to remove the organic content of Colorado River Water and would resort to chlorination treatment even with a recharge plan. The Council did not rebut this contention. In addition, the construction of the Tucson aqueduct does not foreclose future use of recharge, and the Bureau as well as local authorities continue to study and assess the possibilities of using groundwater recharge for water storage. The decision to locate the aqueduct on the West Side does not foreclose recharge, although recharge can best be implemented by an East Side alignment. See EIS at H-52