**HOLY CROSS WILDERNESS FUND,**
Plaintiff–Appellant,

v.

Edward R. **MADIGAN,** Secretary, United States Department of Agriculture; R. Max Peterson, Chief, United States Forest Service; James F. Torrence, Regional Forester of the Rocky Mountain Region of the United States Forest Service; John O. Marsh, Secretary, United States Army; E.R. Heiberg, III, Chief, United States Army Corps of Engineers; Wayne J. Scholl, District Engineer, Sacramento District, United States Army Corps of Engineers, in their official capacities, Defendants–Appellees,

and

City of Colorado Springs and City of Aurora, Defendants–Intervenors–Appellees.

No. 90–1252.

United States Court of Appeals, Tenth Circuit.

April 3, 1992.

Lori Potter of Sierra Club Legal Defense Fund, Inc., Denver, Colo. (Henry W. Ipsen, Charlotte L. Neitzel, and Michele R. Lamontagne of Holme Roberts & Owen, Denver, Colo.; and Frances M. Green of Land and Water Fund, Boulder, Colo., with her on the briefs), for plaintiff-appellant.

Jacques B. Gelin, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C. (Stuart L. Shelton, Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., of counsel; Geoffrey Worstell, Asst. District Counsel, U.S. Army Corps of Engineers, Sacramento, Cal., of counsel; Richard B. Stewart, Asst. Atty. Gen., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C.; Michael J. Norton, U.S. Atty., and J. Greg Whitehair, Asst. U.S. Atty., Denver, Colo.; Dirk D. Snel, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., with him on the brief), for defendants-appellees.

Mark T. Pifher of Anderson, Johnson & Gianunzio, Colorado Springs, Colo. (M. Cole Emmons of Anderson, Johnson & Gianunzio, Colorado Springs, Colo., and John M. Dingess of Petrock, Fendel & Dingess, Denver, Colo., with him on the brief), for defendants-intervenors-appellees.

Before ANDERSON and BALDOCK, Circuit Judges, and A.J. ANDERSON,* District Judge.

* Honorable Aldon J. Anderson, Senior Judge, United States District Court for the District of Utah, sitting by designation.

STEPHEN H. ANDERSON, Circuit Judge.

The central question in this case is whether the Army Corps of Engineers violated the National Environmental Policy Act ("NEPA") and section 404 of the Clean Water Act ("CWA") when it issued a permit to allow construction of the Homestake II water project in the Holy Cross Wilderness Area, located in the White River National Forest outside Denver, Colorado prior to the completion of studies designed to develop a plan to mitigate any adverse impact on wetlands in the Wilderness Area. The appellant contends as follows: (1) the Corps violated NEPA when it issued its section 404 permit on the basis of an inadequate Final Environmental Impact Statement ("FEIS") which did not discuss mitigation measures and by failing to supplement the FEIS after obtaining additional information disputing certain of its conclusions; and (2) the Corps violated the CWA and various implementing regulations when it issued the permit before all environmental studies were completed and subjected to a full public interest review.

The Fund seeks an order invalidating the permit and enjoining the Corps from issuing a new permit until the Corps prepares a supplemental EIS and conducts a "proper" public interest review under the CWA. The district court held there was no NEPA or CWA violation and dismissed the complaint. We affirm. The crux of our holding is that, in the face of considerable conflicting expert views as to the probable impacts of the Project on Wilderness Area wetlands, the Corps' decision to issue the permit with the specific condition that there would be *no* wetlands losses, and with the requirement that a long-term monitoring and mitigation plan be implemented, was not arbitrary or capricious or in violation of any applicable regulations.

## BACKGROUND

The Homestake II project is the second phase of a long-term water development project designed to provide the Colorado cities of Colorado Springs and Aurora (the "Cities") with additional water. It involves the diversion of water from the Cross Creek and Fall Creek drainages in the Wilderness Area to the Homestake Reservoir through a series of surface diversion structures and underground tunnels.[1] Plaintiff Holy Cross Wilderness Defense Fund is a private non-profit organization formed for the express purpose of protecting the Wilderness Area.

The Wilderness Area is an area so designated by Congress under the Colorado Wilderness Act, Title I of Public Law 96–560, 94 Stat. 3266 and to be managed under the Wilderness Act, 16 U.S.C. §§ 1131–1136. The Homestake II project is, however, exempt from the Wilderness Act's ban on water projects in wilderness areas. The Project nonetheless required authorization from the Forest Service under Title V of the Federal Land Policy and Management Act ("FLPMA") so that a portion of the Project could be built on National Forest land.

To this end, the Cities sought in January 1982 a land use easement from the Forest Service. In accordance with regulations of the Council on Environmental Quality ("CEQ"), 40 C.F.R. 1500, *et seq.*, implementing NEPA, 42 U.S.C. § 4332(2)(C), the Forest Service conducted an environmental analysis. In May 1982 the Forest Service issued its draft Environmental Impact Statement ("DEIS"). In the DEIS the Forest Service analyzed six project alternatives. It then conducted more than 20 public hearings to receive input on the proposed project.[2] Among the main areas of

---

1. The Project contemplates the construction of four diversion structures and approximately eleven miles of tunnels. All the diversion structures and most of the tunnels would be in the Wilderness Area.

2. In December 1982, the Subcommittee on Public Lands and National Parks of the House of Representatives Interior Committee criticized

the DEIS as "inadequate to satisfy the requirements of" NEPA and certain sections of the Colorado Wilderness Act. It requested that the Forest Service republish the DEIS and "provide additional opportunity for the general public to submit oral and written comments." Addendum to Appellant's Opening Brief at A37–A38. The Forest Service did not in fact republish the

concern expressed to the Forest Service was the one which is the focus of this case—the impact of the project on wetlands areas in the Wilderness Area.

In 1983, the Forest Service completed its FEIS, concluding that the Homestake project would have no significant impact on wetlands areas or other environmental resources. The Forest Service subsequently issued its Record of Decision ("ROD") and granted the land use easement to the Cities.[3] The easement contained 29 specific mitigation restrictions with which the Cities must comply. In granting the easement, the Forest Service Supervisor concluded that the grant was consistent with Executive Order 11990, "Protection of Wetlands."[4] The decision to grant the easement is not itself at issue in this case.[5]

The Cities then sought from the Army Corps of Engineers the dredge and fill permit which *is* at issue in this case.[6] In order to discharge fill material into creek drainages in the Wilderness Area in the course of constructing the water diversion structures contemplated by the Project, the Cities were required under section 404 of the Clean Water Act, 33 U.S.C. § 1344, to obtain a permit from the Secretary of the Army, acting through the Corps. Before issuing a permit, the Corps must also comply with NEPA.

Apparently concerned that the Forest Service FEIS may not have adequately addressed the question of the impact of the Project on wetlands, the Corps asked its Environmental Laboratory to review the FEIS. In its July, 1983 report, the Laboratory concluded that the Forest Service had not adequately shown that wetland areas would be unaffected by the Project, and it recommended that the Corps acquire additional information. At approximately the same time, the U.S. Fish and Wildlife Service did its own review of the possible impact of the Project on wetlands, and concluded there would be *no* detrimental impact. Addendum Vol. II to Appellees' Briefs at B357.

The Corps thereafter hired a consultant, Aqua Resources, Inc. ("ARI"), to study the matter. In its May, 1984 report, ARI concluded that "[t]here is a potential for significant adverse impacts to downstream wetlands in terms of sequentially (over time) lowering the water table associated with several Cross and Fall creek wetlands." Addendum to Appellant's Opening

---

DEIS and provide additional opportunity for comment. It explained its refusal on the basis that it found no substantive information or alternatives that would warrant republishing the DEIS for public comment.

3. After noting that one of five specific issues of particular importance was the Project's effect on wetlands, the Regional Forester concluded in the ROD that "[s]ince much of the wetland area lies outside of the floodplain and sufficient water is available from sources other than the streams, I conclude that the project will not have a significant effect on wetlands." Forest Service ROD at 3, Addendum Vol. I to Appellees' Answer Briefs at B279. He further concluded "[s]ignificant adverse effects will not occur and this action minimizes the loss of wetlands." Forest Service ROD at 10, *Id.* at B286.

4. Executive Order 11990, issued by President Carter in 1977, directed federal agencies to minimize the destruction, loss, or degradation of wetlands.

5. Pursuant to 36 C.F.R. § 211.18, the decision of the Regional Forester was appealed to the Chief of the Forest Service. Twenty-six parties, including the plaintiff Fund, participated in the appeal. After a hearing and the receipt of written materials from various parties, including the Fund, the Chief of the Forest Service upheld the Regional Forester's decision.

> In so doing, the Chief recognized the: difference of opinion among scientists and knowledgeable persons representing or advising the Forest Service, the Cities, and appellants concerning the adequacy and interpretations of available hydrologic, meteorologic, and biologic information, and of observed on-the-ground conditions.

Decision of the Chief, USDA Forest Service at 8, Addendum Vol. I to Appellees' Answer Briefs at B254. He also noted that there were "contentions that the methodologies used by the Forest Service scientists were inappropriate and are outdated." *Id.* He further directed the Regional Forester to consider the "need for additional mitigating measures that may be required" to compensate for the possible loss of beavers whose activities influence the wetlands. *Id.* at B255. With that last recommendation, he approved the Regional Forester's decision.

6. The Corps had also been a "cooperating agency" with the Forest Service in the Forest Service's preparation of its FEIS.

Brief at A43. It recommended that specific additional studies be done, that pre- and post-construction monitoring be required, and that mitigation measures be developed if the additional studies showed an expected adverse impact on wetlands. *Id.* at A44. After reviewing the ARI Report, the Environmental Protection Agency ("EPA") concluded that "the performance of additional studies ... should be considered before any construction is undertaken in the project area to identify probable wetland impacts." *Id.* at A49.[7]

The Corps did not in fact conduct additional studies prior to issuance of the permit. It did not prepare a supplemental EIS or its own EIS or other environmental analysis. Instead, it adopted the Forest Service's FEIS as its own and issued a permit subject to specific conditions. As the Record of Decision by the Army Corps District Engineer recognized:

> [t]he Forest Service has made a reasoned decision and their judgment may ultimately prove correct. *I believe, however, that due to specific mandates of my authority to protect the waters of the United States, I must take a more conservative approach.* I must assume that without mitigating measures the wetlands in the Fall and Cross Creek drainages would be severely degraded by the Homestake II project.

Corps ROD at 5, Addendum Volume II to Appellees' Answer Briefs at B477 (emphasis added). He therefore issued the permit, but with the following conditions:

> I intend that these wetlands be preserved, but I do not wish to unnecessarily prolong the permitting process or restrict the City's development of their water rights. Therefore, *I am issuing the permit with the condition that the applicants gather the appropriate hydrologic field data,* recommended by Aqua Resources Incorporated, *and design a plan to prevent the loss of wetlands in the Holy Cross Wilderness area.* This plan would be coordinated with the same

technical experts that reviewed the draft ARI report, and *must receive my approval prior to construction of permitted facilities.* The plan also must include post construction monitoring for prevention of long-term impacts of the water diversions.

*Id.* (emphasis added). The permit explicitly stated that "the applicants shall prevent the loss of wetlands." Dept. of the Army Permit at 3, *id.* at B470.

In accordance with the permit's condition of developing a plan to prevent wetlands loss, the Cities directed the preparation of a nine volume Wetland Baseline Report and a Monitoring and Mitigation Plan, issued in September 1986 and March 1987. That Report concluded that the Project "will not cause wetland losses." *Id.* at B503. The Monitoring and Mitigation Plan was revised many times in response to comments and suggestions from numerous groups, including the Chief of the Corps' Regulatory Section and plaintiff Holy Cross Wilderness Fund. The district court concluded it was "well satisfied that public participation and input have been maximized in this case, not only as to the FEIS, but also concerning the nine-volume Wetlands study and the original and final Wetlands Monitoring and Mitigation Plans of September, 1986, and February, 1988." Opinion and Judgment of the District Court at 7, Appellant's Opening Brief at Tab A. In its final version, the Plan was approved by the Corps District Engineer in March 1988. It directed the establishment of an extensive, long-term and on-going monitoring program, with detailed mitigation measures to remedy or prevent wetlands loss. In approving the Monitoring and Mitigation Plan, the Corps opined that "[t]he concepts and methods presented in the Plan will prevent the loss of wetlands in the Holy Cross Wilderness Area." Addendum Vol. II to Appellees' Answer Briefs at B485–486. Both the Forest Service and the Corps agreed that the Baseline Report and the Monitoring and Mitigation Plan did not require the preparation of a Supplemental

---

7. Under section 404 of the Clean Water Act, the Corps and the EPA share responsibility for implementing the specific requirements of the Act.

Environmental Impact Statement under 40 C.F.R. § 1502.9(c)(1)(i) and (ii).[8]

This lawsuit commenced in October 1985, when the Fund filed suit to set aside the land use easement issued by the Forest Service and the section 404 permit issued by the Army Corps of Engineers, claiming both were granted in violation of NEPA. The Fund further claimed that the Corps had violated the CWA. In February 1986, the district court granted the Cities' motion to intervene in the lawsuit.

Cross motions for summary judgment were filed by all parties. After a trial on the merits, the district court dismissed the case, and in the course of dismissal denied all pending motions for summary judgment. The court concluded that under applicable statutory and case law, the Corps had committed no violation of NEPA or any other law. This appeal followed.

### DISCUSSION

■ The ultimate issue in this case is whether the Corps' decision to grant the section 404 permit violated NEPA and/or the CWA. We review such a permitting decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992); *Bowles v. Army Corps of Engineers*, 841 F.2d 112, 116 (5th Cir.), *cert. denied*, 488 U.S. 803, 109 S.Ct. 33, 102 L.Ed.2d 13 (1988); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir.1986); *Sierra Club v. Army Corps of Engineers*, 701 F.2d 1011 (2nd Cir.1983).

A number of subsidiary decisions led up to that ultimate decision, and each one has been challenged. Thus, the adequacy of the Forest Service FEIS and the Corps' decision not to supplement that FEIS are relevant to our analysis of the propriety of the Corps' permitting decision. We turn first to the general contours of NEPA and the CWA.

### A. *NEPA*

■ Under NEPA, "major Federal actions significantly affecting the quality of the human environment" must be preceded by an environmental impact statement or EIS. 42 U.S.C. § 4332(2)(C). *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–49, 109 S.Ct. 1835, 1844–45, 104 L.Ed.2d 351 (1989); *City of Aurora v. Hunt*, 749 F.2d 1457, 1464 (10th Cir. 1984); *Johnston v. Davis*, 698 F.2d 1088, 1091 (10th Cir.1983). The EIS requirement serves two important functions:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson*, 490 U.S. at 349, 109 S.Ct. at 1845. NEPA specifies five specific issues which must be addressed in the EIS:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Thus, "through a set of 'action-forcing' procedures" NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions. *Robertson*, 490 U.S. at 350,

---

8. The Forest Service concluded that the Report and Plan did not present any significant new information relevant to the Project's environmental concerns. The Corps District Engineer similarly concluded that there were no significant changes or new circumstances or information requiring a supplemental EIS.

109 S.Ct. at 1846; *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976); *Park County Resource Council, Inc. v. United States Dept. of Agric.*, 817 F.2d 609, 620 (10th Cir.1987); *Johnston v. Davis*, 698 F.2d 1088, 1091 (10th Cir.1983). It is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. at 1846.

Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. § 1500, *et seq.*, expand upon the appropriate form and content of an EIS. *See Oregon Env't Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987). An agency need not, however, always develop its own EIS. It may "adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations." 40 C.F.R. § 1506.3(a). *See also* 33 C.F.R. § 230.21 (Corps may adopt another agency's EIS as its own, unless it finds "substantial doubt as to technical or procedural adequacy or omission of factors important to the Corps decision."). This is what the Corps did in discharging its obligation to take a "hard look" at the environmental consequences of the Project before issuing its section 404 permit.

1. *Adequacy of an EIS.*

■ The Fund charges that the FEIS prepared by the Forest Service and adopted by the Corps was inadequate. A court reviewing the adequacy of an EIS merely examines "whether there is a reasonable, good faith, objective presentation of" the topics NEPA requires an EIS to cover. *Johnston v. Davis*, 698 F.2d 1088, 1091 (10th Cir.1983); *see also Lake Hefner Open Space Alliance v. Dole*, 871 F.2d 943, 947 (10th Cir.1989); *Lidstone v. Block*,

773 F.2d 1135, 1137 (10th Cir.1985); *City of Aurora v. Hunt*, 749 F.2d 1457, 1465–66 (10th Cir.1984); *Environmental Defense Fund v. Andrus*, 619 F.2d 1368, 1376–77 (10th Cir.1980).[9]

a. *Discussion of Mitigation Measures.*

The Fund particularly argues the FEIS was inadequate in failing to include a plan to mitigate any adverse impacts on wetlands. As the relevant statutes, regulations and case law make clear, "the discussion of steps that can be taken to mitigate adverse environmental consequences" plays an important role in the environmental analysis under NEPA. *Robertson*, 490 U.S. at 351, 109 S.Ct. at 1846; *see also* 40 C.F.R. § 1508.25(b), § 1502.14(f), § 1502.-16(h), § 1505.2(c).

■ The Supreme Court in *Robertson* considered how detailed and specific the mitigation discussion contained in an EIS must be. After noting the "fundamental distinction" between "a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been evaluated" and "a substantive requirement that a complete mitigation plan be actually formulated and adopted," the Court refused to require "a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson*, 490 U.S. at 352–53, 109 S.Ct. at 1847. Nor does NEPA impose any substantive requirement that mitigation measures be implemented. *Id.* at 353, 109 S.Ct. at 1847; *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C.Cir.) ("NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."), *cert. denied*, —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

---

**9.** As this court stated in *Johnston:*
Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. § 4322(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of

the subject matter involved in the five respective areas?
*Johnston v. Davis*, 698 F.2d at 1091 (quoting *Save Our Invaluable Land (SOIL), Inc. v. Needham*, 542 F.2d 539, 542 (10th Cir.1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977)).

■ There must, however, be a "reasonably complete discussion of possible mitigation measures." *Robertson*, 490 U.S. at 352, 109 S.Ct. at 1847. Thus, in *Robertson*, an EIS describing specific mitigation measures which could be taken by third parties, although containing no assurance that they would in fact be taken by those third parties, was held adequate. The Fund contends that, even under *Robertson*, the EIS in this case contained an inadequate discussion of mitigation measures and therefore violated NEPA.[10]

### b. *Incomplete or Unavailable Information.*

The CEQ regulations specify how an agency should proceed when faced with "incomplete or unavailable" information relating to its evaluation of "reasonably foreseeable significant adverse effects on the human environment." 40 C.F.R. § 1502.22. The agency must obtain and include in the EIS information on "reasonably foreseeable significant adverse impacts" if the costs of obtaining such information are not exorbitant. If the costs of obtaining the information are exorbitant "or the means to obtain it are not known" the agency must follow four specific steps. The Fund

argues that the ARI Report demonstrated that the Forest Service FEIS contained incomplete information about wetland impacts. Thus, the Corps was obligated, under the applicable regulations, to obtain complete information and include it in the FEIS or a subsequent NEPA document, *or* to follow the specific steps contained in the regulations and applicable if complete information is unobtainable. The Fund argues the Corps did neither of these things.

### 2. *Supplementation of an EIS.*

Under applicable CEQ regulations, agencies

> [s]hall prepare supplements to either draft or final environmental impact statements if:
>
> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1); *see also* 33 C.F.R. § 230.13(b). The Fund argues that there were both "substantial changes in the proposed action" resulting from the Cities' suggested mitigation measures,[11] and "sig-

---

**10.** The Fund also argues in its Reply Brief that a line of cases from other circuits "suggests that citizen groups cannot bring suit to enforce the mitigation conditions which the Corps places on 404 permits." Appellant's Reply Brief at 14 n. 13 (citing *Dubois v. Thomas,* 820 F.2d 943 (8th Cir.1987); *Harmon Cove Condo. Ass'n v. Marsh,* 815 F.2d 949 (3rd Cir.1987); *Sierra Club v. Train,* 557 F.2d 485 (5th Cir.1977); *National Wildlife Fed'n v. Laubscher,* 662 F.Supp. 548 (S.D.Tex.1987)). The Fund argues the application of that line of authority could "effectively bar meaningful citizen review of Corps mitigation decisions at every stage of the process." Appellant's Reply Brief at 15 n. 13.

Those cases hold that individuals may not seek judicial review of an agency's discretionary decision not to take action to enforce the conditions of a permit. This court explored the rule applied in those cases in *Sierra Club v. Hodel,* 848 F.2d 1068, 1074–76 (10th Cir.1988). We noted the general rule that "an 'agency's decision not to take enforcement actions should be presumed immune from judicial review under § 701(a)(2) [of the APA].' " *Id.* at 1075 (quoting *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). However, we further noted that judicial review may lie where " 'the

substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers.' " *Id.* (quoting *Chaney,* 470 U.S. at 832–33, 105 S.Ct. at 1656). Thus, in *Sierra Club v. Hodel,* we held that the Bureau of Land Management's ("BLM") refusal to act under FLPMA, arguably characterized as "a decision not to take enforcement action," was nevertheless reviewable because FLPMA provides "law to apply" in the form of imposing on the Department of the Interior, and therefore the BLM, the responsibility to define and protect wilderness areas and areas having wilderness characteristics.

The question of the enforceability of the permit conditions in this case is not before us, and we decline at this point to address that issue.

**11.** As the Fund explains in its brief:

> The Corps contemplated substantial changes to the Homestake II project by suggesting that a mitigation plan be developed by the Cities. Thus, the action approved is no longer the construction of Homestake II as planned by the Cities and described in the EIS as Alternative 6; it now includes structural and operational changes in the mitigation plan developed after the EIS.

nificant new circumstances or information" in the form of the ARI Report and the Wetlands Baseline Report.

■ Courts review an agency decision regarding the need for a supplemental EIS under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This is so because the decision whether to prepare a supplemental EIS "is similar to the decision whether to prepare an EIS in the first instance," and is highly factual. *Id.* at 374, 377, 109 S.Ct. at 1860, 1861; *see also Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992); *Sierra Club v. Lujan*, 949 F.2d 362, 367 (10th Cir.1991). Accordingly, "as long as the Corps' decision not to supplement the FEISS was not 'arbitrary and capricious,' it should not be set aside." *Marsh*, 490 U.S. at 377, 109 S.Ct. at 1861.

That standard of review is narrow. *See id.* at 378, 109 S.Ct. at 1861 ("in making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.' ") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). The agency's discretion is broad:

> When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other

hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Id.* 490 U.S. at 378, 109 S.Ct. at 1861. The Fund argues that the Corps' failure to supplement the FEIS was arbitrary and capricious.

## B. Clean Water Act

■ Under the Clean Water Act, discharges of pollutants into waters of the United States are prohibited unless in compliance with the provisions of the Act. 33 U.S.C. § 1311(a), § 1344(a). Thus, the Cities were unable to discharge any dredged or fill material produced in connection with the Project without obtaining a permit, commonly known as a section 404 permit, from the Corps. 33 U.S.C. § 1344(a). "Waters of the United States" includes wetlands. 33 C.F.R. § 328.3(a)(2), (3), (7); 40 C.F.R. § 232.2(q)(2), (3), (7); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *United States v. Marathon Dev. Corp.*, 867 F.2d 96, 98 (1st Cir. 1989); *Missouri Coalition For the Env't v. Army Corps of Eng'rs*, 866 F.2d 1025, 1028 n. 2 (8th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989). The Corps has a particular duty under the CWA to protect wetlands. *See* 33 C.F.R. § 320.-4(b).

■ As part of the permit process, the Corps is obligated to conduct a "public interest review." 33 C.F.R. § 320.4(a).[12] In addition to complying with its own regu-

---

Appellant's Opening Brief at 19.

12. The "public interest review" includes a "careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). Additionally, the Corps must consider the "relative extent of the public and private need" for the proposed project and "rea-

sonable alternative locations and methods to accomplish the objective" of the proposed project. 33 C.F.R. § 320.4(2)(i) and (ii). Mitigation is important in the Corps' permit process. "Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses." 33 C.F.R. § 320.4(r)(1). *See also* 40 C.F.R. § 230.70-§ 230.77 (section 404(b) Guidelines detailing mitigation measures).

lations, the Corps, in issuing section 404 permits, must also comply with guidelines developed in conjunction with the EPA, known as 404(b)(1) Guidelines. 40 C.F.R. Part 230.[13] Finally, 33 C.F.R. Part 230 contains regulations for implementation of NEPA by the Corps, which are intended to supplement the CEQ regulations implementing NEPA. 40 C.F.R. § 1500, *et seq.* The EPA may veto the issuance of a permit which will have an "unacceptable adverse effect" on, *inter alia,* a wetland ecosystem. *See* section 404(c) of the CWA, 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a), 231.-2(e). That has not been done in this case.

Wetland protection is a distinct part of the Corps' responsibility. Indeed, as the Fund points out, the Corps' regulations specifically provide that "[n]o permit will be granted which involves the alteration of wetlands identified as important ... unless the district engineer concludes, on the basis of the [public interest review] that the benefits of the proposed alteration outweigh the damages to the wetlands resource." 33 C.F.R. § 320.4(b)(4).

The Fund argues the Corps violated the CWA by failing to fully and properly con-duct the required public interest review *prior* to issuance of the section 404 permit. In particular, it charges the Corps violated its own regulations requiring a public interest review, as well as the 404(b) Guidelines, by acting (1) on the basis of an incomplete record; (2) without sufficient information to evaluate the economics of the Project;[14] (3) without sufficient information to make the required determination of private and public need for the Project; and (4) without sufficient information to determine if there were practicable alternatives to the Project.[15] It also argues the Corps violated its own regulations requiring mitigation to be considered "throughout the permit application review process." 33 C.F.R. § 320.-4(r)(1).[16] The Fund claims that, by issuing the permit with the *condition* that mitigation of adverse impacts on wetlands be addressed, the Corps impermissibly *presumed* that such mitigation could occur, rather than engaging in a rigorous and thorough analysis of that question prior to issuance of the permit.

### C. *Our Analysis*

We hold that: (1) there was no NEPA violation because the FEIS was adequate

---

13. The 404(b) Guidelines place four general restrictions on discharges: there must be no "practicable alternative"; the discharge must not cause a violation of any other statute or law; the discharge must not "cause or contribute to significant degradation of the waters of the United States"; and all "appropriate and practicable steps" must be taken to "minimize potential adverse impacts" of the discharge—i.e. mitigation measures must be implemented. 40 C.F.R. § 230.10(a), (b), (c) and (d).

Additionally, under 40 C.F.R. § 230.12 the proposed discharge of dredged or fill material must be specified as (1) complying with the Guidelines or (2) complying with the Guidelines with "appropriate and practicable discharge conditions" or (3) failing to comply with the Guidelines where there are practicable, less environmentally harmful alternatives, or there are inadequate mitigation measures, or the discharge will result in "significant degradation of the aquatic ecosystem," or "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply" with the Guidelines. The Corps concluded that the proposed discharge complied with the Guidelines "with inclusion of appropriate and practicable mitigation measures." Addendum Vol. II to Appellees' Answer Brief at B479.

14. The Corps argues that we should not consider this question since the Fund failed to raise it during the administrative proceedings in this case—i.e. in the appeal to the Chief of the Forest Service from the Forest Service's grant of the land use easement. The Fund responds that the issue of the economics *was* raised by another party (the Vail Valley Water District) during the administrative proceedings. That, it argues, is sufficient to permit argument before this court. Further, the Fund argues the issue is fairly before this court because it was fully briefed and argued before the district court. We reach the merits of this issue, *infra* at 1528.

15. The alternative which generated the most discussion throughout the entire FEIS and permitting process was the water exchange alternative, which would obviate the need for any construction in the Wilderness Area. That alternative was rejected as too speculative.

16. 33 C.F.R. § 320.4(r)(1) provides as follows: Mitigation is an important aspect of the review and balancing process on many Department of the Army permit application. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses.

and was properly adopted by the Corps; the need to seek out additional information on "reasonably foreseeable significant adverse impacts" was obviated by the decision to issue the permit with the specific condition that there be *no* wetlands losses; the decision not to supplement the FEIS with either the information contained in the ARI Report or the Baseline Report and Monitoring and Mitigation Plan was not arbitrary or capricious; and (2) there was no violation of the CWA *or* applicable regulations.

 We first consider whether the Corps violated NEPA by simply adopting the Forest Service FEIS rather than completing its own EIS. As indicated, this the Corps may do if the statement is adequate under applicable regulations. 40 C.F.R. § 1506.3(a); *see also* 33 C.F.R. § 230.21 (Corps may adopt another agency EIS unless it finds "substantial doubt as to technical or procedural adequacy or omission of factors important to the Corps decision."). We therefore evaluate first the adequacy of the FEIS. The thrust of the Fund's challenge to the adequacy of the FEIS is that it failed to adequately discuss wetland impacts or include a sufficient mitigation plan.[17] We disagree.

 The Forest Service FEIS specifically addressed the impact of the Project on wetlands. It simply reached a different conclusion from that reached by the Fund and its experts. We cannot say that the FEIS's conclusion that, due to other water sources, stream diversions in the Wilderness Area would not adversely affect wetlands reveals a lack of a "reasonable, good faith, objective presentation" of adverse environmental effects. Considering the standard by which this circuit reviews the adequacy of an EIS, we must conclude that the FEIS in this case was adequate. *See John-ston v. Davis*, 698 F.2d 1088, 1091 (10th

Cir.1983); *see also Lake Hefner Open Space Alliance v. Dole*, 871 F.2d at 947.

The lack of a detailed mitigation plan in the FEIS then flows from that initial conclusion that there would be no adverse effect on wetlands. While the Fund may disagree with the correctness of that conclusion, it may not complain that the FEIS is inadequate in failing to discuss specific mitigation measures directed at an adverse environmental impact the Forest Service did not, in good faith, think would occur.

We therefore conclude that the Corps did not err in adopting the Forest Service FEIS, rather than completing its own EIS. We turn now to whether the Corps' should have complied with various regulations governing agency action when faced with "incomplete or unavailable" information relating to its evaluation of "reasonably foreseeable significant adverse effects on the human environment." 40 C.F.R. § 1502.22. The Fund argues that the ARI Report recommending additional studies to determine possible adverse impacts on wetlands demonstrated that the FEIS contained "incomplete" information.

 In our view, the necessity for specifically seeking out and including in either the FEIS or a subsequent or supplemental NEPA document such additional information was obviated by the Corps' decision to issue its permit with the specific condition that there be no wetlands losses. By making that decision, the Corps no longer needed to evaluate "reasonably foreseeable significant adverse impacts" on wetlands, because it *assumed* such impacts and essentially guaranteed that the Cities mitigate those impacts. Thus, no NEPA violation follows from the Corps' alleged noncompliance with regulations concerning unavailable or incomplete information.

---

17. The Fund also suggests that the FEIS was inadequate in failing to discuss all practicable alternatives. NEPA requires an EIS to include alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). The CEQ regulations state that the discussion of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Because the Corps' regulations and the 404(b) Guidelines require the same discussion of alternatives, and no one suggests that the nature of the requirement differs significantly under NEPA or the CWA, we discuss this issue in the context of our analysis of whether the Corps violated the CWA and applicable regulations in issuing the section 404 permit. *See infra* at 1528.

■ Similarly, we hold that the Corps' decision not to supplement the FEIS, after learning from ARI that additional data were needed to fully evaluate the impact of the Project on wetlands, and after directing the development of a comprehensive Monitoring and Mitigation Plan, was not arbitrary or capricious under *Marsh,* 490 U.S. 360, 109 S.Ct. 1851. The arbitrary and capricious standard of review is a "narrow one," which mandates considerable deference to agency decisions. *Id.* at 378, 109 S.Ct. at 1861. Our own careful review of the record in this case reveals that, throughout this entire dispute, expert views on the highly technical question of how best to determine the possible impacts of the Project on wetlands in the Wilderness Area have differed. While the initial Forest Service FEIS concluded there would be no adverse impacts on wetlands, the ARI Study questioned that conclusion. But the Baseline Report again concluded there would be no wetlands losses. The Forest Service and the Corps have been aware of, and have responded to, these differing views at various stages and in different contexts. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861; *see also Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991), *petition for cert. denied,* —— U.S. ——, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992); *Friends of the Earth v. Hall,* 693 F.Supp. 904, 922 (W.D.Wash. 1988) ("A federal court is not in the business of resolving scientific disagreements between plaintiffs' experts and the Corps' experts."). We conclude that the Corps' decision not to supplement the FEIS with information and studies provided by its expert consultants and generated by the Baseline Report and the Monitoring and Mitigation Plan, was a "reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861.

This is particularly true in light of the decision to issue the permit with the specific condition of no wetlands losses. As we just concluded in connection with the "unavailable or incomplete" information argument, that conditioned permit essentially obviated the need for a supplemental EIS. The point of a supplemental EIS, like an original EIS, is to foster informed and thoughtful agency decisions and to promote public involvement in actions affecting our environment. *See Robertson,* 490 U.S. at 349, 109 S.Ct. at 1844–45; *Park County Resource Council, Inc. v. United States Dept. of Agric.,* 817 F.2d 609, 620 (10th Cir.1987). When the Corps determined that there would be no adverse impacts on wetlands, and developed a plan to ensure that result, the need for publication of studies relating to possible effects on wetlands disappeared. *Marsh's* specific conclusion that NEPA imposes no substantive requirement that an EIS, or by implication a supplement thereto, contain "a fully developed plan that will mitigate environmental harm before an agency can act" supports our decision that the Monitoring and Mitigation Plan itself did not necessarily need to be the subject of a supplemental EIS. Thus, we affirm the district court's conclusion that there was no NEPA violation in the Corps' actions in this case.

Finally, we consider whether the Corps' permitting decision violated the CWA and applicable regulations. We hold it did not.

■ The Fund asserts that a number of regulations were violated. We address each one in turn. The Fund argues that the Corps violated Corps regulations requiring mitigation to be considered "throughout the permit application review process." 33 C.F.R. § 320.4(r)(1). We agree with the Corps that the record in this case is replete with a consideration of mitigation measures. Indeed, the ARI Report was sought so that possible impacts of the Project on wetlands, and possible measures to mitigate those impacts, could be evaluated. The Corps' permitting review process culminated in a permit requiring a comprehensive mitigation plan to *prevent* wetlands losses. It is simply a mischaracterization of the record in this case to assert

that mitigation was not considered throughout the permit review process.

The Fund also asserts that the Corps violated its own regulations and the 404(b) Guidelines by failing adequately to evaluate practicable alternatives to the Project. Again, we believe the record undermines the Fund's argument.

The Fund in particular focuses on two alternatives which it says were inadequately considered by the Corps: Plan D, involving tunnels, a pumping station and pipelines for the diversion of water below the wetlands and pumping of water to the Homestake I Reservoir; and a water trade alternative. We agree with the Corps and the Cities that the record reveals that Plan D was viewed as similar to Alternative 4, which was discussed in detail in the FEIS. The primary difference between Plan D and Alternative 4 is that Plan D would use an existing reservoir and Alternative 4 would require a new one. The Corps, in its ROD, rejected alternatives involving pumping water, rather than using a gravity flow system, because *inter alia,* "pumping would consume large quantities of electrical energy." Corps ROD, Addendum Vol. II to Appellees' Answer Briefs at B475. While the Fund correctly points out that a new reservoir (Alternative 4) is probably more environmentally damaging than using an existing reservoir (Plan D), one of the specific problems identified by the Corps as a reason to reject Alternative 4—large electrical energy consumption for pumping—is common to *both* plans.

The water trade alternative was rejected in the FEIS and by the Corps in its ROD as too speculative and dependent upon too many uncertainties. We cannot say that that decision was in error. *See National Indian Youth Council v. Watt,* 664 F.2d 220, 226 (10th Cir.1981); *see also City of Aurora v. Hunt,* 749 F.2d 1457, 1467 (10th

Cir.1984) ("An agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or as in this case, impractical or ineffective.").

In sum, we view the Forest Service FEIS and the Corps' discussion of alternatives to be adequate.[18] "We uphold [an agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

The Fund also argues the Corps acted without sufficient information to evaluate the economics of the Project or to make the required determination of the private and public need for the Project. 33 C.F.R. § 320.4(a)(2)(i). Our careful review of the record leads us to conclude that the Corps satisfied its obligations in these two regards. While the Corps and the Forest Service were careful to indicate that the FEIS "is not a substitute for State and local land and water use planning," Forest Service ROD at 4, Addendum Vol. I to Appellees' Answer Briefs at B280, their consideration of the economics and the public and private need for the Project was sufficient such that the Corps' permitting decision based thereon was not arbitrary or capricious. *Cf. North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1541–42 (11th Cir.1990) ("NEPA does not confer the power or responsibility for long range local planning on federal or state agencies.") (footnote omitted).

Finally, the Fund argues that the Corps engaged in an impermissible "permit first—mitigate later" plan, in violation of the CWA. We disagree. As we have stated before, the permit in this case specifically stated that no wetlands losses would be

---

**18.** The Corps and the Cities argue the Fund did not urge the alternative of Plan D on the Corps or the Forest Service, and may therefore not raise it on appeal to this court. We have held that "[w]e will not review information that [a party] failed to include in the administrative record or present before [the agency]." *New Mexico Env't Improvement Div. v. Thomas,* 789 F.2d 825, 835–36 (10th Cir.1986); *see also Wilson v. Hodel,* 758 F.2d 1369, 1373 (10th Cir.1985)

("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency."). While that requirement does not undermine an agency's responsibility to consider all reasonable and practicable alternatives, we view with suspicion the Fund's championing now of an alternative whose elimination long ago by the Forest Service and the Corps went unchallenged.

allowed, and that a mitigation plan would have to be developed to ensure that result. While we agree with the district court that "the normal order of events is not what occurred in this case, there is no doubt that the Corps' permitting decision was not arbitrary or capricious, or in violation of any applicable laws.

## CONCLUSION

This is an unusual case. We would not normally expect to see deviations from the typical order of events in NEPA and CWA cases. Nonetheless, the particular circumstances of this case lead us to conclude that the agencies involved took many "hard looks" at the Project's environmental consequences, that their decisions were informed even if disputable, and that no NEPA or CWA violations occurred. For the foregoing reasons, the decision of the district court is AFFIRMED.

